Good afternoon, everyone. The panel has before it three cases for argument. A fourth case will be submitted later today, just on the briefs, without argument. That case is Appeal 1529 from 2009, Gentile v. Sun Products. On the argument list, we'll hear argument first in Micron Technology v. Rambus, Appeal 1263 from 2009. Mr. Phillips, good afternoon to you. Welcome back to the court. Please proceed. Good afternoon, your honors, and may it please the court. The fundamental issue in this case is under what circumstances a duty to preserve arises. And the district judge erred both as a matter of law and as a matter of fact in deciding that there was a duty to preserve documents that arose in December of 1998. She erred as a matter of law because she placed the issue in terms of when litigation was reasonably foreseeable defined as when a potential claim is identified. Is the question before us a question of the application of the incorrect legal principle or is it a question of inappropriate factual determinations under that principle? Judge Linn, it's actually both. I think she's wrong as a matter of law in the standard that she applied. I think the right standard is that litigation should be probable and free of any significant contingencies. I think that's the approach that Judge White adopted, and I think it's the right legal standard. And clearly under that standard, December 1998 would not stand. But even if the court were to be more generous, it still seems to me that the December 1998 date is clearly wrong. Because the only thing that happened in December 1998 is the nuclear winter scenario memorandum. And that memorandum could not be plainer in saying two very fundamental things. First of all, we're talking about a very hypothetical situation, comparing it to completely crazy events in the Black Forest, and saying explicitly that with respect to litigation, hopefully never. So the head of patents at the client at that stage is specifically saying we hope there's never going to be any litigation. So the one date that it seems to me you cannot legitimately choose to impose this duty is December of 1998. And then it seems to me the best one to go to is December 1999. Getting back to the standard, it seems to me it's not enough to say that the standard should be reasonable foreseeability. Because that has a lot of little nuanced meanings. Well, I agree with you completely, Judge Lynn. I think you have to give much more concrete meaning to that. Because every patent holder, frankly, every potential litigant in the United States today is going to take seriously what this court says on that. It might just be the standard giving further meaning to the phrase foreseeable, reasonably foreseeable. I think, frankly, the ABA standard and the one that Judge White adopted, which is, Judge White is a little less clear about this, but the ABA standard is quite clear. The litigation must be more probable than not. And the gloss that Judge White put on it, which I think is the legitimate one, is to say, look, are there significant contingencies that have to be resolved before litigation becomes a realistic prospect? And in this case, there are six of them, not the least of which is what is meant. What is it that you understood Judge Robinson to apply as a standard? Well, what she says explicitly is a potential claim is identified. And what she looked at was the language in the nuclear scenario, nuclear winner scenario, that says, well, if all of this happens, you could potentially go after Micron and other manufacturers under these broad theories. So are you reading her as saying that potential just means any probability, even .001 or what? Well, I don't know if it goes all the way back to mere possibility. I'm not sure exactly. I mean, again, it's hard for me to read Judge Robinson's mind. But what I do know is that her articulation of it is a standard that is horrifically low and one that cannot be the right test. And I agree with Judge Lynn, even to just use the fairly mushy formulation of reasonably foreseeable doesn't provide, when you're talking about a duty that triggers the death penalty for your patent rights. You think that she clearly wasn't thinking in terms and analyzing in terms of more probable than not? Well, clearly she wasn't thinking of it in those terms, because there's no way that you could apply that standard to these specifics. And, indeed, I don't even see Micron's brief as defending that argument, that if she applied the right standard, that she wouldn't have been wrong as a matter of law or would have been indefensible under those circumstances. There's another interesting twist to this. Maybe twist is not the right word, but speaking in terms of reasonable foreseeability from the perspective of a potential plaintiff in a lawsuit is a little different from reasonable foreseeability in terms of someone that perceives a risk that he or she may be a potential defendant. In other words, or to put it in the context of this litigation licensing scenario we have here, we have a company that says, well, I have intellectual property that I'm going to exploit, and I can exploit it by licensing it or, if necessary, litigating. I don't want to litigate. That's not my goal. My goal is to license. And I recognize, however, so from that perspective, you know, it's not reasonably foreseeable that that patentee is going to file a lawsuit voluntarily. That's not the contemplation of the company. And that is precisely this record, Judge Weinberg. And then you have this scenario that, well, I recognize, however, that as a patentee, if I want to license, maybe the industry is not going to buy it, and maybe I have to file a test lawsuit and establish my rights, at least get people to pay attention. Now, at that point, approaching somebody with a prospective license, it might be reasonably foreseeable that that licensee is going to balk and file a lawsuit, a DJ action. But it just seems to me that what this phrase reasonable foreseeability means has different nuances and different meanings when you're talking about potential plaintiffs or potential defendants. Well, I agree with that. I mean, I don't think there's any question that there's a prism through which you're going to be analyzing these facts. And a plaintiff is in control of some aspects of the litigation more so than a defendant. And so it may be that, in general, you would expect the duty could arise somewhat sooner. But I think that's why it's even more important to get away from notions of reasonable foreseeability and look at whether or not litigation is probable. And, again, to me, the linchpin for this analysis is this question of these contingencies. Even if the test is whether the litigation is probable, it's odd to speak in terms of whether the litigation is probable when you're talking about litigation that the party itself, the party accused of spoliation, would initiate. Because whether that lawsuit is ever filed or not is entirely within that party's hands. The party says, well, I'm not going to file a lawsuit. That's not what I have in mind. And if you look at the contemporaneous documents as they existed at the time, the evidence is overwhelming that, first of all, we didn't have the patents that were the basis for this lawsuit. They didn't exist until six months after the date that Judge Robinson identified. The evidence is overwhelming that Rambis did not want to alienate all of these manufacturers by even bringing the licensing exercise to bear. So if you're a step removed, I mean, those are two enormous contingencies that, at a minimum, make it less probable than not. Whereas it's clearly the case that in some vague sense it would be reasonably foreseeable, particularly if all you're talking about is a claim identified, because it is. But when you have these kinds of fundamental contingencies in place, it seems to me the Court ought to send a message to everyone that, one, document retention policies are perfectly permissible. Arthur Anderson says that. They are a necessity given the world we live in these days. And, therefore, when you're going to impose potentially both inference-creating duties and, more fundamentally, patent-destroying duties, it's very critical that the Court be extremely clear as to when that duty arises. And, candidly, I think the better way to think about it, given the circumstances in this case, is we put a litigation hold in place. I mean, we recognize we had a responsibility in that regard. It seems to me the duty really ought to be on the other side to say, why isn't that the right time in which to do it in the absence of clear evidence of bad faith or prejudice to the other side? And even if you analyze this case on the terms that the district judge did and said, OK, I think there's been a duty that's been breached here, the reality is there's no evidence, independent evidence, of bad faith. She deemed bad faith solely from the violation of the duty alone. She doesn't have any separate findings or evidence that somebody said, well, go out and just make sure you destroy this, this, and this document so that we'd be in a position better to bring our lawsuit down the road. That's the kind of evidence that usually exists in these cases. She did consider the record. It considered the fact that the discussion about document retention was in the context of some of these memos and presentations relating to the litigation licensing strategy. It wasn't an independent thing. And in that sense, a red flag goes up that maybe this was not proper. She also considered the fact that there was some indication that there was an effort to preserve things that might be helpful as distinguished from other things that might not be helpful. That's a factor. So it seems to me she did consider the record and considered a lot of the factors, both pro and con, the decision. But again, in trying to sort this out, from my perspective, I'm having difficulty with the standard because we've got all kinds of things bounced around. It has to be imminent. That's a standard. About to occur. That's a standard. Probable. Highly probable. Slightly probable. Might be probable. I'd just take probable, Your Honor. All of these standards. And again, I'm not sure how we are to evaluate whether Judge Robinson properly applied, properly recognized this standard, let alone properly applied it. Well, Judge Lynn, as I say, it seems to me quite clear that her articulation of reasonably foreseeable is then reduced down to potential claim being identified. And that, to me, is a standard that is way too low and that would impose a duty much, much too soon in this process in a way that, as far as I'm concerned, no court has articulated. And I think, candidly, if this court were to do so, would send shockwaves throughout the patent community. What do we do with this situation? Suppose I own a patent. You're infringing. And let's say there's no doubt about the infringement. And the only question is, can we agree on a royalty for a license? And so I'm going to demand a very high royalty. And I know going into the negotiation that it really isn't a negotiation. I'm just giving you a chance to save me litigation costs by agreeing to take a license for the amount that I consider my minimum. And so in that circumstance, unless you agree to my predetermined royalty amount, isn't the chance of my suing you 100 percent? Way more probable than 51. I mean, obviously, I don't want to war with your hypothetical. But the truth is you probably want to know a whole lot of additional facts about what is our relationship in general. Because litigation is not a cost-free exercise, both in terms of expense, as I stand here and can attest to that, but more fundamentally in terms of the relationships between the parties. These are long-term relationships. And so it's one thing to come in and say, you know, I think you're in fact violating my patent, and I think you owe me a significant royalty. It is a very different question to say, and I'm going to be prepared to actually sue you with a public piece of litigation and what flows from that. So while I could envision circumstances where it could be a foregone conclusion, and you could have a lot of documents that would suggest that it's a foregone conclusion, I could also see a circumstance in which it would be a very highly contingent. How about here? As I recall, the Cooley-Godward lawyer, Dan Johnson, I think his name was, predicted that if Rambis held out for 5% or more, there was no chance anybody would pay that much and that there would be a lawsuit for sure. And as I recall, the strategy was to offer a license at 5%. So that would superficially at least seem to suggest that the license offer would surely be turned down by any defendant in the chip-making industry, and therefore there would be at least a likelihood of a lawsuit. What's the matter with her analysis to the extent that she depended on that prediction that 5% nobody would accept? They would rather fight in a lawsuit than voluntarily take a license for 5%. Right. Well, there are two things I would say about that. First of all, remember, Chief Judge Michel, that was a conversation that took place very early in 1998, long before she created a duty under these circumstances. So even Judge Robinson didn't view that as a signal event that suddenly moved this process back in time and created a duty in the first instance. And second, even though you say that that's, again, this is in the context of a broad litigation strategy that's being outlined by a litigator who says you do this, this, and that and throws out a ton of ideas, in that process you say, look, you asked for a royalty that high, you're probably going to invite litigation. That's not a shocking statement. It also doesn't mean that if you go in with a 5% number that that's not your sticker price as opposed to what you really think is going to ultimately negotiate down to. And again, while they were told that, there's no evidence that certainly at that stage in the process anybody remotely was close to coming to the point of deciding that there was going to be litigation. And again, you've got to, you know, Isn't it the case that the strategy throughout 1998 and 1999 was to hold out for 5%? No, the strategy in 1998 and 1999 was actually to try to make RDRAM the number one product in the market. Of course, but if there was a shift to the synchronous technology, then there was going to be a whole different approach. Well, there might be a whole different approach. I mean, I think that's the problem there is, first of all, until the summer of 1999, you don't even have the patents in place in order to allow you to go after DDR or SDRAM. That's just because the patent office is slow. They had amended their claims and they had applied and they knew that if they got the patent, they had a vehicle for litigation or licensing, whichever would work better. Well, I mean, I'm not sure it's that easy to say, but the bottom line is if you don't have the patent, it is extremely difficult to bring the litigation. And if your focus is to try to convince the industry to embrace RDRAM, probably the last thing in the world you really want to do is hit them with something that says, we're going to expose you to potential litigation. That's not the way you develop the kind of partnership. Because remember, the process here is one where we provide them with our technology and we work together in tandem with them in order to create this market leader going forward. That's a relationship of trust and confidence. You don't break that willy-nilly. You wait until you have all of the contingencies that would allow you to predict that the only choice is litigation. Are you going to stick with more probable than not, or are you going to insist on all contingencies have been resolved? I think all significant contingencies. All significant contingencies. Yes. I mean, obviously not every contingency is going to be resolved before you're going to litigate. But I think if you don't have the patent, if you don't, if you're still holding out to be the market leader and you don't have board approval. So the operative event here is the refusal of the proffered license in November of 1999. I think that is exactly the point in time when it became clear to everyone. And so no duty arose until that day when they said, hell no, we're not buying the license. I think at that stage, yes, it was appropriate from then on. One other point to make in all of this, Your Honors, which is the complete disconnect in Judge Robinson's analysis here, is there was a very large shred that took place before the duty arose in this case. And she makes no effort at all in trying to evaluate, either as a matter of bad faith or as a matter of prejudice, what information survived that first completely lawful shred date that was in fact shredded in the second date that would have at all been relevant. That's not her fault because no records were kept of what was shredded in any of the shred dates. Well, in a sense, it's not her fault. But in a sense, it seems to me it's Micron's fault because Micron has the responsibility to come forward with specific documents. Yeah, but Micron and other accused infringers can't control whether Rambis keeps records of what they shred or doesn't keep records of what they shred. But Chief Judge Michel, as far as I know, no one who has a document retention policy maintains records of all the documents they kept. Otherwise, there is no purpose in having a document retention policy because you're essentially retaining all of those documents. So you will invariably have that happen. So the question is, what do you do under those circumstances? And the Third Circuit is quite clear that it is their responsibility to show concrete methods or mechanisms by which there would have been prejudice. And that means that it was their responsibility to show what survived shred day one that was perfectly permissible and what wouldn't have survived shred day two that somehow prejudiced them. And the reality is, if you look at the JEDEC... Did the policy as announced to the employees provide for retaining much of anything? I thought the policy was quite strict along the lines that if it's older than X, erase it, burn it, shred it. There's no question that with respect to emails that was true.  Yeah, but I'm asking whether the policy called for them to keep documents that were older than the stipulated time frame. I don't think that the policy dictated precisely what you had to. But it didn't exclude anything. It said burn everything, in effect, because it didn't say but retain X, Y, and Z. But the flip side of that is, Your Honor, they also didn't say, Look, we're going to have litigation coming on board, and these are the documents we want to make sure you don't have. And that, frankly, is the circumstance in which most of the litigation that... They said something close to that about the email. They were worried that the email would be discoverable. And apparently the email messages themselves had been erased, but the backup tapes hadn't been, so they then made an effort to erase the backup tapes because of fear of discoverable material adverse to them being found. But, Chief Judge Michel, every document retention policy is intended to eliminate discoverable material. The reason for that is when you get hit with a discovery request, especially these e-discovery requests, it is enormously expensive. And if you don't keep the documents, that expense goes down. And the question, you know, it seems to me it's too late in the day at this stage, after Arthur Anderson, for this Court to revisit that kind of an issue. The other thing about it, just to clarify, the degaussing that took place also predated the date when the duty arose. So that degaussing in the first instance was perfectly legitimate even under Judge Roberts. You'll have the reserved rebuttal time that you sought to reserve, and we've given you over six extra minutes. So, Mr. Vincent, would you add six minutes to Mr. Powers' time, and we'll hear now from Mr. Powers. Thank you, Your Honor. Thank you, Your Honor. This case raises issues going straight to the heart of the integrity of the process by which district courts resolve patent litigation in this country. Rambis' rule, if adopted by this Court, would create a safe haven for spoliators, particularly spoliators who are patent holders, who can control and manipulate the timing of litigations that they control. What test do you think should be applied? The test which is applied uniformly across circuits is the test of reasonably foreseeable without further gloss. And that test, though it certainly is not entirely precise as stated, is applied in many, many other contexts, in the familiar context of tort context and others, without requiring more precision, because that is the test that should be applied. But reasonable foreseeability in terms of whether a party will be a potential plaintiff initiating a lawsuit would almost seem to apply to all patentees at all phases of all operations. I disagree. I think that reasonably foreseeable doesn't mean possible. Judge Robinson applied no such standard. That is not the test she applied. Does it mean probable? It does not. It means something less than probable. It does. It means reasonably foreseeable, which means something that is objectively, not subjectively, objectively viewed as something which is sufficiently foreseeable to impose the burden. Well, it's reasonably foreseeable that a big company that has 12 ongoing licenses, all of which have been honored for years and years and years, at some point maybe some licensee decides it's time to stop. These patents really aren't worth anything. Now, that would put the entire licensing program in jeopardy. I disagree that that would be reasonably foreseeable. It's not reasonably foreseeable that at some point some licensee might stop paying royalties? Under the cases, that is not reasonably foreseeable as I understand it. The facts here are so extreme that you don't need to go try to find the line. He said they're so extreme the other way. Well, it's for you to decide which of us is right, but let me tell you why I think they're extreme. They're extreme in this case because Rambis had a specific plan that was driven by the CEO and approved by the board in March of 1998. That plan had a specific proposal and a timetable of two years, and Rambis adhered to the plan almost to the letter and almost to the day. Their plan in March of 1998 was a two-step plan. The first step was stay quiet about our attempts to enforce about non-Rambis DRAM so that we could try to get everybody to do, whoever's going to do Rambis DRAM, let them do it until the point of no return, as Mr. Clark put it. Once they've hit that point of no return, which he predicted would be the first quarter of 2000, at that point we could start our enforcement program with respect to non-Rambis DRAM. And at that point, in March of 1998, they knew that they were going to demand 5%, not just as an initial negotiating point where we'll go down from there to where we need to, but because it was specifically designed to have a business purpose, which is to try to coerce people to use the Rambis DRAM. So they were going to hold out for 5%. That was in the board of directors' approved specific plan, and they knew in March of 1998 and from then on that no one would pay it. They knew they'd have to litigate. What about the fact that the patents ultimately brought against Micron, as I understand it, didn't exist at the time that Judge Robertson found a duty not to destroy documents to arrive. The first patent in suit in this case issued in June of 1999, so it was technically after that before the shred day. So it was six months after the time she found a duty arose. But it's irrelevant. The reason it's irrelevant is that they didn't need to sue on those patents because beginning in 1992 and in 1997 and in 1998, they identified other patents that they could have sued on, the CEO Tate, Karp, and Steinberg, all established patents they could sue on. So the fact that they ultimately selected different patents to sue on was irrelevant. Karp, Steinberg, and Tate all had documents at the time saying, we have patents, we can sue on if we need to. Specifically, in late 1998, in October, Karp writes an email to the board and other executives saying, we can sue now, but it's better to wait. Why? Because then we can make people go to the point of no return on investment in Rambis D.R.A.M., and then we can sue them starting in 2000. And they knew, to your point, Judge Lynn, they knew not just that it was possible that someone might refuse, they knew no one would accept 5%, and specifically they identified Micron as someone who would never ever sell it. How did they know that other than the speculative comment in March of 1998 by Dan Johnson? They knew that because of the experience of Mr. Karp, who was very experienced in the licensing industry of that industry from Samsung, and Karp said it as well. Both of them said it. Johnson said it to Karp, and Karp said it to the Rambis executives, In March of 1998? That was in February of 1998. February was the meeting with Johnson, I thought. Exactly, February of 1998. And March was the first planning within the company, I guess. March was the time the plan was presented to the board of directors. The planning began in January, so they spent two months preparing this plan to present to the board, which the board approved. During that process, Karp and Johnson had these discussions. Johnson told Karp, that's the testimony, and then Karp specifically pointed that out to the company also in February. So they knew at that time, by March of 1998, that their specific plan with a specific timetable, and they adhered to the timetable. They sued Hitachi in the first quarter of 2000, exactly as predicted in March of 1998. It was the exact timetable they predicted and adhered to. And the proposal that Rambis is asking this court to adopt, would say that a conniving, manipulative patent holder such as that, who stays in what they call stealth mode. Stealth mode why, according to Karp in October of 1998? Well, we don't want people filing declaratory judgment actions against us. If they knew what we knew, they would have DJ jurisdiction. So we have to stay in stealth mode. That answers the question, I think, of whether there was anticipation of litigation or reasonably foreseeable litigation. They were specifically trying to avoid communicating the information they had, which would have created DJ jurisdiction if they communicated it. How in the world could that not be reasonably foreseeable at that point? And they knew that and said that, and Karp explicitly testified to that in this trial. And those are good minutes we do have, right? March of 1998? March of 1998 is not board minutes. It's a presentation that was made to the board that Tate directed and Karp drafted. We have Karp's records of what we think he said to the board in March of 1998? We have the PowerPoint slides which Karp presented, and we have Karp's testimony about his presentation based on his memory of the time. But we have nothing in terms of the reaction of the board members because those board minutes were shredded? We have nothing contemporaneous. In this case, we have admissions that the board approved and did not reject the plan. But we have no contemporaneous documents about the time of the article. So you would say that the duty not to shred arose in March of 1998? I will. And let me clarify. But even Judge Robinson didn't find a duty until December of 1998? I disagree slightly. What Judge Robinson found is that it arose no later than December. She did not say it arose at an instant in time because of one particular fact, and that's an argument that Rambis makes throughout its brief, as if the only fact this court may consider in justifying or affirming her decision is whatever occurred actually in December. So is your view that the so-called nuclear winter memo of late fall, I believe, in 1998, was just the final straw on top of all the things that happened earlier in 1998? Precisely. So your purpose is to convince her that not later than December of 1998, the duty to not shred was in effect? That is precisely right. If you start with the March board presentation, it says we can be ready for litigation in four to six months. It says as part of our litigation strategy, not corporate governance strategy, as part of our litigation strategy, we're going to create a document retention policy that will get rid of our documents. This is not a document retention policy where you go to your corporate governance experts and say what should we do to get our house in order. Is it your view that the licensing activity and the potential litigation activity were proceeding simultaneously on parallel paths as an integrated strategy? Precisely. Their plan from the beginning was license as much as you can, particularly the Rambis DRAM, and don't rock that boat, as Clark put it in October of 1998. Don't go and stay in stealth mode until that has gone as far as it can go, and then we're going to assert patents on the non-Rambis DRAM, and if some pay license is great, but we're going to hold out for 5%, and we know they won't pay it, and we know in particular Micron will, as they put it, fight tooth and nail and never settle. So then in your view, there was never any doubt about the likelihood of litigation, and as it turned out there was no doubt about the predicted timing either, but at most the timing might have been subject to change, but not the odds of filing suit. The issue, as they put it, was always not if, but when. And Tate, for example, when he met with Intel in April of 1998 and learned the shocking news that Intel was now backing away from their support of Rambis, which was horrible for them, that was in April of 1998, he said this may force us to, quote, play our IP card earlier. It shows exactly that two-step plan. We're going to do it as long as we can. The timing may change, but the next step is whatever the non-compatible, non-Rambis DRAM is, we're going to go get licenses for that, and we're going to hold out for our 5%, and we know we're going to have to litigate to support the rate. What about Mr. Phillips' suggestion that significant contingencies all have to be removed before a no-shred rule kicks into effect? I would offer two thoughts on that. First, as a matter of law, there is no case, no appellate case in the Third Circuit or anywhere which supports that as the standard. It's made up of whole cloth. There is nothing. But second, it puts the control completely in the hands of the patent holder. A patent holder could say, well, I'm going to require that board approval, which I know will be given because it's our fundamental business plan and has been for two years. Board approval has to be given, and therefore I can spoliate up until the moment the board decides to approve the litigation. That's not a rule I think this court wants to promote. That puts the timing entirely in the hands of the spoliator, and the issue for this is supposed to be an objective one. As soon as that risk is sufficiently foreseeable, we want to impose that burden on them to protect their litigants. Well, what about the uncertainty of companies as to whether they're under a duty or not if we have so indeterminate a standard as reasonably foreseeable? That standard is sufficiently determinate for virtually every tort cause of action in this country for the last 150 years. That is the test. Maybe it works well in other areas or all other areas, but doesn't work well in the context of this sort of case. That's the suggestion of Rambis, that there is no case that so holds, and there is certainly no case that provides for this nebulous, significant contingencies or test. Well, Mr. Phillips referred to Judge White's ruling, and I understand we aren't right now addressing that. That's a later argument today. But he did use that concept and that terminology, which he seemed to draw inferentially from the Fourth Circuit case of Silvestri. So what's your reading of Silvestri? If Judge White's reading is not a reasonable one, what is a reasonable reading? I don't believe that is a reasonable reading of Silvestri. Silvestri didn't require that the contingencies, particularly those in the hands of the spoliator, be removed. That was not the holding of Silvestri. Silvestri merely applied the reasonably foreseeable test. Judge White, even in his motion for reconsideration, backed off of that test and said I was applying reasonably foreseeable and said I wasn't applying a probable test and vacillated, frankly, on his motion for reconsideration order on the question of what standard he was applying and backed back to. I was applying reasonably foreseeable all the time. So I don't think it's fair to say that Judge White found that in Silvestri because, although I think a fair reading of his original opinion certainly did, he then backed off on the motion for reconsideration. And there is no court that holds that that is the test. And there is no court that holds that imminence is the test. Does the scope, in this case a rather broad-seeming scope of the destruction, does that influence the reasonably foreseeable test or is that an irrelevant fact that has nothing to do with probabilities? The massive scale of the destruction, I think, relates more to the bad faith and prejudice issues than it does to the question of foreseeability. On the question of foreseeability, I did want to respond to the point that Counsel for Rambis has made both in their briefs and today. They argue that Judge Robinson applied an incorrect standard that any potential claim or identification of a potential claim, and that is not the test she applied. In their brief, the blue brief at 31, the reply brief at 4, when they quote her opinion, there's an ellipsis before identified. The word before identified in her opinion at page 33 is thus, thus identified. It's not the identification of any claim. And the preceding sentences say, quote, A duty to preserve evidence arises when there is knowledge of a potential claim. A potential claim is generally deemed cognizable in this regard when litigation is pending or imminent or when there is a reasonable belief that litigation is foreseeable. That was the test she applied, not identification of any potential claim. And the omission of thus makes clear exactly what she was doing. What does reasonably foreseeable mean? Her language is very confusing to me. She says the reason to believe that it's foreseeable. I can't integrate reason to believe. Who's believing? A reasonable belief that litigation is foreseeable. The test, I think that's just another articulation of the test that when litigation is reasonably foreseeable, which makes it objective, not subjective. But reasonably foreseeable when the decision to litigate or not is in the hands of the person being charged with exfoliation. That makes this case much worse. I agree completely because the parade of horribles that Ramos' brief lays out, that litigation is always possible in the abstract as a defendant, that clearly does not satisfy a reasonably foreseeable test. And no court has held, and we're not arguing for such a standard. But where a party has a business plan and a business model which says two years from now will be the time when we think we can start suing and we'll have to sue to get the rate we want, to say that that is not reasonably foreseeable is to me both violating the deferential standard of review that applies in this context, because that's what she found after listening to 38 witnesses, and also violates common sense. If it's in your control and it's part of your business model and you've written yourself internally that said, I know we're going to have to litigate to make this rate because no one's going to pay it, it's too late. Where do we find that statement? Which one? The one you just quoted, or paraphrased. I know we're going to have to litigate because no one will pay this rate. JA20498 is the February of 1998 memo from Karp to Cooley, which is MTX290. It says the 5% royalty rates quote, will probably push us into litigation quickly. And that Micron would file... So this is the example of Karp from his own experience not quoting Johnson, but from his own Samsung experience. It's Karp's notes of a meeting, and Karp saying that's what he understood at the time. That's what Johnson thought, or that's what Karp thought? Both. How do we know it's both? We know that Johnson's told it to him, and we know that Karp put it in his notes as a statement. And we know that Karp also independently said, as to Micron specifically, they will fight tooth and nail and never settle. And that's in joint appendix at 15, footnote 16, the testimony cited by Judge Robinson. That was known. That was absolutely known. And the fact that it's Johnson saying it is independently significant because it's Johnson upon whom Rambis relies repeatedly for their good faith in putting this program together. And so they can on the one hand say, we're relying completely on Johnson, and on the other hand saying, well, we're going to totally ignore what he tells us about litigation being foreseeable. Now Johnson testified in Delaware, right? He did, live. And he gave some explanation that he didn't really know all the facts. Well, the facts that he didn't know were the facts that Rambis didn't tell him regarding their specific plans. So for example, Rambis did not tell him, and he said, I don't believe it's true, when in fact there was an internal memo from Tate to Karp saying, I want you to identify a specific litigation target by the third quarter of 1999, and we're going to sue them in 2000. That was one of his specific goals that Tate said, I want you to adopt and put into your plan in 1999. And Johnson said, I didn't know that, and I don't think it's true. Over and over again they rely upon Johnson for the supposed good faith of the program, but then don't tell Johnson about the plans they specifically have. Did Johnson say that if he had known those facts he would have never recommended such a broad scale destruction policy? He didn't go that far, I believe. What did he say? He made clear that he would not recommend any expoliation while litigation was reasonably foreseeable. He specifically said that. Well, sure, but that's just quoting the law. It is, and the level of outrage where he said, I don't believe it, suggests quite strongly that that was inconsistent with his understanding at the time. What about the bad faith business? You said earlier that that really had to do with relieving Likon of the burden of proving particular prejudice. No, not quite. Bad faith and prejudice are both independent requirements, but they are balanced, and the law is clear with regard to expoliation that expoliation is one thing and then the remedy is a different thing. Expoliation can be mere negligent destruction. Expoliation requires you to preserve, and you may have just lost it inadvertently, but the level of remedy for that may be quite different for something with bad faith. That's the conflation. So it goes to the dismissal versus some lesser sanction? Precisely. And with regard to bad faith, the evidence cited by Judge Robinson was substantial. She went through 30 pages of factual findings about all of the evidence, and Rambis' primary complaint appears to be that she didn't go back and pincite the prior paragraphs in supporting her conclusion that bad faith was established quote, so clearly and convincingly. She had just spent 30 pages isolating and identifying that evidence, and the law does not require her to go through and identify which particular paragraph she's relying upon for the unambiguous conclusion that she found bad faith clearly and convincingly and found intent clearly and convincingly. Your extended time has expired, so thank you very much. Thank you. Mr. Phillips, you have the three minutes you sought to reserve before we consumed all your time with questions. I'm always happy to answer questions, Your Honor. You know that. Let me start off by responding to Judge Lynn's hypothetical, because it seems to me it's the complete answer to this case. You said what would happen if a licensee violated the license under those circumstances, and the truth is if you were the patent person, not a lawyer, perhaps not a lawyer, but the patent person inside, and you were worrying about the nuclear winner scenario, what would it look like? It would be the situation where you have all these licensing arrangements, and one of them has stopped, in fact, complying with the licensing arrangement, and what would you do? And you would write out something that says you would bring litigation, and I'm quite certain that Micron today would be screaming that that's all you need in order to generate an obligation to save every document that you ever produced under those circumstances. What I find disturbing about the litigation today, and unfortunately I have to admit likely the last four or five times I've been in this court where you're litigating about conduct of the individual litigants rather than the merits of these cases, and it seems to me that if this court adopts a standard that is too demanding on the litigants in order to create these kinds of opportunities to challenge the enforceability of their rights, that we will end up with even more litigation, and so that the inequitable problems, the inequitable conduct litigation that's been a horror of the past is just going to turn into a spoliation problem going forward into the future. But don't you agree that we have to balance that risk or that harm against the opposite harm of if the standard is too lax, the patentee potential plaintiff will be able to delay the date of having to retain documents as long as he wants to? Up to a point, but the reality is, and again it goes back to how you apply the probable standard in my judgment, which is what are the contingencies? You still had to have R.D. Ram become not dominant. That was a completely open question Patents had to issue. The license negotiations had to fail. You still had to get board approval. And it had to be a product that was going to compete with it. Certainly the existence of the products and the ability to reverse engineer it. Are you going to hold out for standard that only after the board approves the filing of the lawsuit does a no-destruction obligation arise? I could imagine in some circumstances. I'm not sure that's the categorical answer because it could well be that there are situations where you conclude that the board de facto approves a lot of things and therefore you don't need the sort of de jure approval. But when it's only one of six independent contingencies that are not frankly in our control, it seems to me that that reduces it substantially below the probable standard, which again, remember, that's the ABA standard, which seems to me a perfectly appropriate way to proceed. Should we be adopting a federal circuit rule for uniformity purposes or is this a matter of interpretation of third circuit law? As a technical matter, I think it is an interpretation of third circuit law but the reality is there is no third circuit law so I think the right answer for this court is rather than try to predict, the better answer would be to try to come up with a rule that you think is the appropriate one in order to guide both this litigation and other litigation. If I can, a couple points factual that I'd like to address. One is... Briefly. I will be very brief, Your Honor. With respect to Karp and his assessment of this, Karp is not a lawyer. He's not a litigator. Rambis was not involved in huge litigation. He was involved in licensing and therefore it was not his independent judgment as to how this would play out. The 5% royalty was never demanded. The highest was 4.5% and others were 3.5% so the 5% was out there but it never got implemented under those circumstances and with respect to board approval, you asked the question, were the board minutes destroyed? The answer is they weren't. The board minutes were kept. I mean, this is not a massive destruction approach that caused a lot of data to be unavailable. 700,000 pages were available. Under these circumstances, Your Honor, the death penalty was not warranted. All right. We thank both counsel for a skillful argument. We'll take the appeal under advisement.